## Hazel Richason, Appellee, v. Chicago & Western Indiana Railroad Company, Appellant.

### Gen. No. 14,385.

MASTER AND SERVANT—*when former not liable for injury to child of latter.* If a master provide a dwelling for a servant and his family, he is not liable for an injury to a young child of such servant occasioned by its falling through a trap door which had been left open by its mother, and the fact that it was inconvenient to keep such trap door continually closed is not material, nor is the

CHICAGO—FIRST DISTRICT—JUNE, 1909.    39

Richason v. Chicago & Western Indiana R. R. Co., 150 Ill. App. 38.

fact that the master had promised to change the construction of any effect upon the question of liability.

Action in case for personal injuries. Appeal from the Circuit Court of Cook county; the Hon. SAMUEL C. STOUGH, Judge, presiding. Heard in this court at the March term, 1908. Reversed. Opinion filed June 15, 1909.

**Statement by the Court.** This is an appeal from a judgment of the Circuit Court of Cook county in favor of the plaintiff below and appellee here against the defendant below and appellant here. The judgment is for $9,000 and was rendered on the verdict of a jury in an action for personal injuries suffered, as it was alleged in the first count of the declaration (which was filed April 12, 1904), by the plaintiff's falling through a trap door and down a certain steep flight of stairs in a building (at 125th street and Torrence avenue, in Chicago), which building the family of which she was one was allowed to occupy as a part of the wages which her father, one F. L. Richason, was to receive from the defendant as a bridge tender for the defendant. It is alleged in said count that at the time she moved into said building it was in an unsafe and dangerous condition, which defendant knew and plaintiff did not know, and that it was by reason of this unsafe and unsuitable condition the defendant fell down and was injured August 1, 1899.

The second count of the declaration avers a duty of the defendant to keep the premises involved in a reasonably safe and suitable condition, so that persons rightfully on said premises would not be injured, and alleges that nevertheless it allowed the said building and particularly a certain stairway therein, to be and remain in an unsafe and dangerous condition, so that plaintiff fell down the stairway and struck the lower floor and injured herself, so that as a result she contracted a severe hip disease.

The third count alleges that the plaintiff, at the time of the accident, was with her family living in the premises involved at the invitation of the defend-

ant company, and that it was its duty to keep it in a reasonably safe and suitable condition, but that the stairway from the lower floor to the second floor was protected with a certain heavy trap door, which said trap door was so large and heavy that it was impossible to raise and lower said door, and consequently said stairway and trap door were unsafe; that the defendant was notified of said defective condition, and promised ''to repair and fix'' them, and place them in a suitable condition; that said plaintiff thereupon, relying on said promise, continued to remain on said premises, but that said defendant carelessly and negligently failed to remedy said defective condition, by reason whereof the plaintiff was caused to fall through said trap door and down said stairway, to her great injury and damage.

A fourth count filed later (November 28, 1905) alleged that the defendant leased the said building to F. L. Richason, the father of the plaintiff, and that at the time of said leasing there was a certain trap door of great weight used for the purpose of covering a steep flight of stairs leading from one floor to another, which said trap door and stairway were dangerous and unsafe, as the defendant knew; that it promised to rectify and repair them; that relying on that promise, the said father of the plaintiff entered into said premises as a tenant, and that the family of said Richason, the father of the plaintiff, consisted of himself, his wife and children, of whom the plaintiff, a minor of tender years, was one. It alleged also that because of the careless and negligent failure to repair and render safe the trap door and stairway, the plaintiff fell through the trap door and down the stairway, permanently injuring her.

A fifth count, filed at the same time, was substantially to the same effect.

A sixth and seventh count were afterward (September 25, 1907) filed.

The sixth (or third additional count, as it is de-

CHICAGO—FIRST DISTRICT—JUNE, 1909.    41

Richason v. Chicago & Western Indiana R. R. Co., 150 Ill. App. 38.

nominated) alleged that the defendant maintained a certain bridge near 125th street and Torrence avenue in Chicago, and near by a certain house for the bridge tender to reside in with his family, in order that the bridge tender might better attend to his duties about said bridge, and that the plaintiff's father was the bridge tender and at the special request of the defendant occupied the house as such bridge tender, with his family, which included his daughter, the plaintiff, who was a child of but six years of age.  It further alleged that about five weeks before the accident, and at other times prior to that, the father of the plaintiff complained to the defendant concerning the construction of a trap door, hatchway and staircase on said premises; and the defendant agreed with and assured the father of the plaintiff that the defendant would cause the trap door, hatchway and staircase to be changed within a reasonable time, so that the same would be reasonably safe for the occupants of the house.  This promise the defendant broke, and the plaintiff, in consequence, fell down the hatchway.

A seventh count (the fourth additional count) was filed November 4, 1907.  It differs from the 6th count principally in alleging that the promise of the defendant was to reconstruct and change the house so that the hatchway and staircase leading to the basement therein would be inclosed on the main floor by a partition and vertical door.

To each and all of these counts the defendant pleaded the general issue of not guilty.

The issues were submitted to a jury.  After the plaintiff's evidence was in, the defendant moved for a peremptory instruction, which was refused.  It then moved, by separate motions, for instructions to disregard each of the counts of the plaintiff's declaration.  This motion was also denied.  At the conclusion of all the evidence the defendant renewed this motion, and it was again denied.  The defendant then moved seriatim for an instruction to the jury to disregard

42      APPELLATE COURTS OF ILLINOIS.

Richason v. Chicago & Western Indiana R. R. Co., 150 Ill. App. 38.

each respective count of the declaration. Each motion
was denied. At the request of the plaintiff the court
gave the jury two instructions, which in the record are
denominated A and B, and at the request of the de-
fendant three others, which are called 1, 2 and 3. A
fourth instruction was tendered by the defendant and
refused. To the giving of the instructions A and B,
and to the refusal of instruction 4, the defendant ex-
cepted.

The jury returned a verdict for the plaintiff for
the sum of nine thousand dollars. A motion of the
defendant for a new trial was overruled and the judg-
ment herein appealed from followed.

In this court the defendant has assigned as error
rulings on evidence, the denial of a peremptory in-
struction, the refusal to instruct the jury to disregard
the several respective counts of the declaration, the
denial of a new trial, the alleged excessiveness of the
verdict, and that the verdict and judgment were
against the weight of the evidence.

It may be properly noted in this statement of the
pleadings and proceedings below, although really im-
material to the decision here, that originally the Belt
Railway Company of Chicago was a co-defendant to
the suit, but after the plaintiff's testimony was in,
the cause was by the plaintiff discontinued against
that company and all the pleadings amended accord-
ingly.

WILLIAM L. REED and WILLIAM H. RUST, for appel-
lant.

DARROWS, MASTERS & WILSON and F. W. BENTLEY,
for appellee.

MR. JUSTICE BROWN delivered the opinion of the
court.

The facts out of which the alleged liability of the
defendant to the plaintiff in this case arose, are these:

The plaintiff, Hazel Richason, fell through a trap

door hereinafter described, while her mother was in the basement below, and was thereby injured. She is a daughter of Frank A. Richason, who brings the suit as her next friend. In 1899 his family consisted of himself, his wife, a son and two daughters. His son was about twelve years old, his daughter, the plaintiff, about six years old, and the youngest about a year and a half old. Prior to May 1st he was employed by the Chicago and Western Indiana Railroad Company at Hammond Junction, at 87th street and Eggleston avenue, at the interlocking tower—"handling the switches and watching in the interlocking tower"—he says, "under George Espey, signal engineer." Mr. Espey was the signal engineer with an office at the Dearborn station in the city of Chicago.

As the contention of the plaintiff involved the relation which existed between the Chicago & Western Indiana Railroad Company and Frank A. Richason in the occupancy of the house where the accident to his daughter occurred, it is perhaps desirable to give his own version of it as nearly as possible. He testified: "Shortly prior to May 1, 1899, I had a talk with Mr. Espey about being transferred; he said I could make a change and he made provision to move my household goods to the Calumet Drawbridge, 127th and Torrence avenue.   *   *   *   There was a small interlocking tower and a drawbridge over the Calumet river. There were different classes of traffic up and down the river, pleasure boats, government boats, and boats loaded with lumber. I opened the derails connected with the interlocking tower, connected with the drawbridge, and then we had to swing open the bridge and let the boats through. Mr. Espey, before I went to the bridge, gave me instructions with reference to my duties at this bridge, that I was to be on duty 24 hours in the day. I was not living on the railroad's premises before I went to this bridge. I understand Mr. Espey made arrangements with the superintendent to move me. He furnished an engine

44 APPELLATE COURTS OF ILLINOIS.

Richason v. Chicago & Western Indiana R. R. Co., 150 Ill. App. 38.

and car and a crew to go with the engine. The goods were moved from an express wagon to the car, and the section men unloaded them at this house, which is about 50 feet south of the tower at the river, and about 8 feet from the tracks and on the right of way. It was a small two story house; two sleeping rooms and a front room up stairs, and a small kitchen, dining room and pantry in the basement. Nothing was ever said about my paying any rent, and no rent was ever paid. It took two men to turn the bridge, the night man and the day man. I would get the signal to go to the bridge by an electric bell operated by a crank generator and push button from the tower to the house. There were two houses occupied by the bridge men.''

Mr. Richason also testified, ''I reported to Mr. Espey while I worked at the bridge, and received orders from him. He was signal engineer, office at Dearborn station. He had charge of the signals at the bridge and hired and discharged the men in my department.

When I moved the freight car was set at 87th street, about half a mile from where I lived. I hired a dray to take my goods over to the car. I had been out to this Calumet bridge several times before I moved there, and my wife had been there once.''

Mr. Espey, called as a witness for the defendant, testified: ''I transferred Richason from Hammond Junction to the draw bridge and made arrangements with the superintendent to have his household goods transferred. * * * When I assumed charge of the signal department, Richason was working for the Western Indiana Road. Richason was subject to call at any time. He was under my supervision and subject to discharge by me at any time. He was expected to be on watch or at the house practically during the 24 hours of the day during the months when navigation was open on the river. He was expected to be there so he could help turn the bridge. During the

Richason v. Chicago & Western Indiana R. R. Co., 150 Ill. App. 38.

time Richason lived there, the company did not exercise any control over the interior of the house that I know of. I had no control over the buildings of the company other than the bridges or tower houses. My control extended more particularly to signal appliances. Repairs to buildings were made by men under my supervision.''

The contention of the appellee on this evidence is that the occupancy of the house in question by Richason was occupancy by the company. The building was a part of the appurtenances of the road, and in it the company undertook to shelter Richason and his family, so that he could better perform his duties. It therefore owed his daughter Hazel the duty of providing a reasonably safe place, considering her age. So runs the argument of the appellee.

In the view which we take of this case, we do not consider it necessary to pass on the question whether the appellee is accurate in this contention in regard to the nature of Richason's holding and of the appellant's duty. It is controverted by the appellant, but we will assume, for the purposes of our discussion, that it is correct.

The question then follows: Did the defendant, appellant, provide a reasonably safe place to Richason and his family, including Hazel?

The appellee argues that it did not, because, as Mr. Richason testified: ''The house was about 18x24—3 rooms on the main floor. The main room was off a platform next to the tracks. There was a hole cut through the floor with a pair of stairs leading into the basement with a trap door on hinges, a ring in the trap door to lift it up and down and a chain connected with the trap door to hook it up against the side of the wall. This was in the front room upstairs. There was no railing around this hatchway. The door weighed 49 pounds and was 49x26 inches. The top thickness was maple and the bottom Georgia pine. It fitted in the hatchway very tight. * * * The trap

door raised up to open it and would close itself if you let it down. It would stay open without using the chain. The door would sometimes bind so that it was hard to open. * * * I had nothing to make it loose with when it bound."

The position that the house because of this condition of things was an unsafe and dangerous place for the plaintiff Hazel Richason, is based on the fact that she was a girl between five and six years old, that her mother, Mrs. Bertha Richason, was a woman who weighed but 83 pounds and found it very hard to lift this trap door from below when she wanted to come up the stairs from the cellar or basement, although, as she says, she did it, having occasion to go down cellar a good many times a day, until she nearly "ruined her health," until she "could see it was hurting" her. She also testified that there was nothing preventing her from getting into the basement by going out of the front door, around the side of the house and into the basement from the outside. "But," she said, "still I couldn't go out in all kinds of weather and go around the house and down in the basement."

It is insisted that because of this hardship or inconvenience which would result from keeping closed the trap door described, it was necessary for the defendant to assume that it would be justifiably left open. Indeed it is said the hasp on the wall showed that this was expected. If it were left open, the danger followed.

As a matter of fact, one child of Mr. Richason had fallen through the door, and for that reason a request for and promise of a change had been made before the accident which is alleged to have crippled the plaintiff. It is argued that not only was a staircase like this with an open door at the head of it dangerous in itself, but that it was doubly so to children as an attractive and dangerous play place.

Here again, all that in the argument of plaintiff which is controverted may be assumed as accurate ex-

cept the main proposition. But there is nothing in this evidence which shows us an unsafe construction. The normal state of a trap door is to be closed, except when persons are passing through. When a mother who has small children takes the chance of leaving a trap door open, situated as this one was, it is *she* who makes the situation unsafe, not the construction. It may be, and probably was in this case, extremely inconvenient for her to avoid subjecting her family to this danger, but still it was but an inconvenience and not a necessity. It was a proper subject of complaint by the servant to the superior that he and his family were subjected to this inconvenience, and a proper subject for the superior to take up with a promise of change. But this does not make the construction dangerous nor the place appointed for the servant to live in itself dangerous.

For that reason, the promise of change, if in this case it was made by an authorized agent of the defendant, was of no importance to the issues in this case.

By promising to remedy an inconvenience, the master does not change the inconvenient construction into a dangerous one.

Because therefore we cannot hold that the Company is shown to have neglected any duty from it to the plaintiff, nor that it was negligent in any manner, we must reverse this judgment. The case should have been taken from the jury. The natural but unsafe action of the plaintiff's mother, for which the defendant was not responsible, was the cause of the accident.

The judgment of the Circuit Court is reversed.

*Reversed.*